# In the United States Court of Federal Claims

No. 15-248C
(Filed: March 25, 2016)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

NORTHWEST TITLE AGENCY, INC.,

|  |  |
|---|---|
| *Plaintiff*, | Motion for Summary Judgment; Contract Interpretation; |
| v. | Unambiguous language; Extrinsic Evidence; Trade Practice |
| THE UNITED STATES, | |
| *Defendant*. | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

*Gary Bruce Bodelson*, Minneapolis, MN, for plaintiff.

*Amanda L. Tantum*, United States Department of Justice – Civil Division, Washington, DC, for defendant.

## OPINION

BRUGGINK, Senior Judge

     This is a suit alleging a breach of contract by the United States. Plaintiff, Northwest Title Agency, Inc. ("NWTA"), seeks $4,242,850 to compensate for revenue lost when it was denied the opportunity to charge closing fees to homebuyers purchasing foreclosed property from the Department of Housing and Urban Development ("HUD"). Pending is defendant's motion for summary judgment pursuant to Rule 56 of the Rules of the Court of Federal Claims ("RCFC"). For the reasons set forth below, the court grants defendant's motion.

BACKGROUND

A.      Factual Background[1]

In early 2010, NWTA and HUD entered into three contracts pursuant to which NWTA would provide real estate property sales closing services for single family properties owned by HUD.[2]  The contracts set forth numerous Contract Line Item Numbers ("CLINs") by which NWTA would be paid a set amount for each CLIN.  *See* Def.'s. Appx. 16. ("As total compensation for all services performed under this contract, the contractor will be paid according to the . . . [CLIN] prices listed below.")  The contracts noted that the unit price per closing "shall be inclusive of <u>all</u> costs."  *Id.* at 16. (emphasis in original). The contracts further stated that "[e]xcept as explicitly allowed in Paragraph C.4.4.2.2 below, the purchaser, lender, and/or seller shall not pay any additional costs for closing services, including an additional lender fee."  *Id.* at 17.

NWTA alleges that, throughout the entire duration of the contracts, for closings in Missouri, HUD refused to allow NWTA to charge any fees to homebuyers for any closing services, Am. Compl. ¶¶ 7, 17, 23, and that for closings in Wisconsin and Minnesota, HUD refused to allow NWTA to charge any fees to buyers for the physical closing during which the sale documents were presented, executed, and notarized." *Id.* ¶¶ 13, 19.[3]  NWTA contends

---

[1] The facts are drawn from the parties' briefs and are not in material dispute.

[2] The first contract, C-DEN-02376, was signed on February 11, 2010, and applied to the geographic area of Wisconsin.  Contract C-DEN-02375 was signed on April 12, 2010, and applied to the geographic area of Minnesota. Contract C-DEN-02363 was signed on April 28, 2010, and applied to the geographic area of Missouri.  Although the contracts differed with regard to the amount of services estimated and the price for each service to be paid to NWTA, the three contracts were otherwise identical as to their provisions and organization.  Thus, when the court refers to a specific section, that section is identical across all three contracts.

[3] These allegations are raised in the amended complaint in Count I.  Count II sought the recovery of additional costs incurred by NWTA when it maintained increased staffing levels to handle an increased volume of closing orders to be
(continued...)

that the prohibition on charging a fee to buyers of HUD-owned homes was in contravention of typical industry practice and constituted a breach of the contracts, which it believes unambiguously allows for charging buyers closing fees.

B.      Procedural Background

NWTA filed its complaint on March 10, 2015.  Defendant filed a motion to dismiss pursuant to RCFC 12(b)(1) and 12(b)(6) on May 12, 2015. NWTA then filed an amended complaint on June 26, 2015.  On July 14, 2015, defendant filed the instant motion, then styled as a motion to dismiss pursuant to RCFC 12(b)(1) and 12(b)(6).  On December 4, 2015, the court held oral argument on defendant's motion.   Subsequently, the court ordered that defendant's motion be converted into a motion for summary judgment pursuant to RCFC 12(d) and allowed supplemental briefing. ECF No. 20.  The matter has now been fully briefed and is ripe for disposition.

DISCUSSION

The central issue to be resolved by the court is whether the contracts are ambiguous as to whether NWTA is permitted to charge closing fees to purchasers of HUD-owned single family houses.  If the contracts clearly prohibit charging purchasers with additional closing fees, then HUD could not have breached the contract when it prevented NWTA from charging such fees. Defendant argues that the contracts unambiguously provide NWTA with compensation for all services related to closings but prohibit NWTA for seeking compensation, a second time, from homebuyers.  Defendant further argues that the only exception to this rule is provided by Section B.4.2., which allows a contractor to seek additional fees when a property is being sold subject to the Asset Control Act ("ACA").  Since NWTA never alleges that any of the costs it seeks to now recover arose from the sale of ACA properties, defendant contends that NWTA was not entitled to additional compensation of any kind for services provided related to closings under the contracts.

_____

(...continued)
received from HUD based on modifications to the contracts.  On July 14, 2015, plaintiff voluntarily dismissed this claim.  ECF No. 11.  Only Count I of the amended complaint remains before the court.

NWTA, on the other hand, argues that the contract is unambiguous in favor of NWTA. NWTA asserts that "the purpose of the contracts was to represent only HUD as seller" and that "buyers were never included as parties to the contracts between HUD and NWTA." Therefore closing services provided under the contracts at issue would be only for HUD as the seller of the properties irrespective of any services that might be provided to the buyers/lenders, according to plaintiff. NWTA further asks the court to consider extrinsic evidence of industry practices before determining whether an ambiguity in the contract language exists. NWTA offers the affidavit of Wayne Holstad, its Chief Executive Officer, for the proposition that it is customary within the title insurance and settlement service industry for a single entity to represent both the buyer and the seller in a transaction and for that entity to receive payment from both parties to the transaction.

The starting point for any contract interpretation is the plain language of the agreement. *Foley v. United States,* 11 F.3d 1032, 1034 (Fed. Cir. 1993). A contract's language "must be considered as a whole and interpreted to effectuate its spirit and purpose, giving reasonable meaning to all parts." *Hunt Constr. Group, Inc. v. United States,* 281 F.3d 1369, 1372 (Fed. Cir. 2002). If the language of the contract is clear and unambiguous, the court's review is generally limited to the contract itself. *See Teg-Paradigm Envtl., Inc. v. United States,* 465 F.3d 1329, 1338 (Fed. Cir. 2006) (unambiguous language "must be given its 'plain and ordinary' meaning and the court may not look to extrinsic evidence to interpret its provisions.") ("*Teg*"). Ambiguity arises when a contract is susceptible to more than one reasonable interpretation. *Id.* (citing *Edward R. Marden Corp. v. United States,* 803 F.2d 701, 705 (Fed. Cir. 1986)).

Although review of an unambiguous contract is generally limited to the contract itself, there are exceptions to the rule. One such exception is where trade practice and custom may inform the meaning of an otherwise unambiguous term. *Teg,* 465 F.3d at 1338 ("Even when a contract is unambiguous, it may be appropriate to turn to one common form of extrinsic evidence—evidence of trade practice and custom.") (citing *Hunt,* 281 F.3d at 1373). The Federal Circuit has held that "evidence of trade practice may be useful in interpreting a contract term having an accepted industry meaning different from its ordinary meaning—even where the contract otherwise appears unambiguous—because the parties to a contract . . . can be their own lexicographers and . . . trade practice may serve that lexicographic function in

some cases.'" *Hunt,* 281 F.3d at 1373 (quoting *Jowett, Inc. v. United States,* 234 F.3d 1365, 1368 (Fed. Cir. 2000)).

After examining the language of the contracts, the court agrees with defendant that the contracts unambiguously prohibit NWTA from charging buyers additional costs for closing services. Section B.4.4.1 reads, in pertinent part:

> As total compensation for all services performed under this contract, the contractor will be paid according to the Contract Line Item Number (CLIN) prices listed below for closings conducted. The unit price per closing specified herein shall be inclusive of <u>all</u> costs, including, but not limited to: the cost of all labor; supervision; fringe benefits; . . . any and all licenses, insurance, certificates or permits as stated in Section C, Paragraph 4.1.2; and all office requirements unless otherwise specifically identified in this contract.

(Emphasis in original.) Section B.4.4.2 further provides: "Except as explicitly allowed in paragraph C.4.2.2 below, the purchaser, lender, and/or seller shall not pay any additional costs for closing services, including an additional lender fee." The meaning and intent of these two sections is clear and unambiguous: NWTA is to be paid according to the listed CLINs for all services performed under the contract and may not charge any purchaser, lender, or seller any additional costs for closing services. Although Section B.4.4.1 provides an extensive list of services, it is not meant to be exhaustive, as evidenced by the language "shall be inclusive of all costs, including, but not limited to." Thus, any services rendered on behalf of buyers, although not explicitly listed in the price schedule, are included under this expansive language.

Furthermore, Section B.4.2.2 explicitly states that a purchaser, lender, and/or seller shall not pay any additional costs for closing services. The one exception, as noted in Section B.4.2.2, is Paragraph C.4.4.2.2, which provides in relevant part:

> The Contractor's unit fee includes the cost of document preparation of the deed, preparation and recordation (see 4.5.3) of any applicable security documents that name seller as the secured party, the HUD-1 closing statement, and any other document requested by HUD. The purchaser will pay all other

> closing costs, including recording fees and other costs related to
> the purchaser's acquisition.

Although this section allows NWTA to charge purchasers for closing costs, the location of this section within the contract as a whole makes clear that it only applies to properties covered by an ACA Agreement.  Section 4.4 of the contracts is entitled "Special Programs" and outlines unique steps that the contractor must take when dealing with property under two specific government programs: the Good Neighbor Next Door program (4.4.1) and the Asset Control Area program (4.4.2).  It is clear from the organization of the contract that the ability to charge purchasers for closing fees was intended to apply only to situations in which the property being sold was covered under an ACA Agreement, presumably because such properties require additional work to be done beyond what would normally be expected for non-ACA properties. The general rule that additional fees cannot be charged is presented at the beginning of the contract and specifically lists the only exception to this rule. That exception is located under a section number which discusses only special programs.  It follows then that the only time it was contemplated that NWTA could charge buyers additional fees was in an instance of that one listed exception.

NWTA argues that this section is actually unambiguous in allowing NWTA to charge purchasers closing fees.  NWTA avers that "[t]he plain language of the contracts, considered in the context of the contemporaneous circumstances of the contracts . . . clearly establish[es] that NWTA was 'explicitly allowed' under the contracts to charge the buyer/lender 'all other closing costs' not referenced in Section C.4.2.2.2" and that "the contract language was not intended to limit the services which would be separately provided to the buyer, or the amount that would be customarily charged to the buyer/lender when the closing entity was retained by the buyer/lender to provide settlement services." Pl.'s Supp. Resp. 10-11.  For the reasons set out above, the court rejects this argument.

NWTA further argues that the court should consider the affidavit of Wayne Holstad as extrinsic evidence to show customary trade practice and custom, namely that it is customary for a closing service agent to charge both the buyer and seller a fee if that agent represents both parties in the transaction, and that the amount to be paid to NWTA under the contracts was "only enough to pay for the closing services customarily charged to sellers, and were not sufficient to reflect any amount for closing services for buyers/lenders." *Id.*

at 9.  NWTA cites to *Metric Constructors, Inc. v. National Aeronautics & Space Admin.*, 169 F.3d 747 (Fed. Cir. 1999) to bolster its argument that the court should look at evidence of trade practice when interpreting the contracts before determining if any ambiguity exists.

NWTA's reliance on *Metric Constructors* is misplaced.  The instant case presents an almost identical situation to the one considered by the Federal Circuit in *Jowett*, *Inc. v. United States*, where, as here, the plaintiff contractor argued that, even if there was no apparent ambiguity in the terms of a contract, the court should look to trade practice to interpret its terms.  234 F.3d 1365, 1368 (Fed. Cir. 2000) ("[Plaintiff] reads *Metric* to support the following proposition: when the language of the contract does not reflect industry practice, the contract is ambiguous and consequently the evidence of industry practice is admissible to aid in the interpretation of the contract.").  The court rejected that argument, holding that such a holding would "enable[] industry practice to create an ambiguity, even before the language of the contract is itself analyzed to determine if an ambiguity lies within the four corners of the contract."  *Id*.  While noting that parties to a contract can act as their own lexicographers, the court found that there was no term in the contract that had an accepted industry meaning different from its ordinary meaning nor was there a term with an accepted industry meaning that was omitted from the contract.  *Id*.  The court concluded by noting that "affidavits describing a supposed common industry practice . . . are simply irrelevant where the language of the contract is unambiguous on its face."  *Id.* at 1369.

Here, as in *Jowett*, plaintiff is attempting to inject ambiguity into a contract when there is none.  Affidavits describing the customary practice of charging fees to both sides of a transaction are irrelevant here because the contracts unambiguously prohibit the charging of such fees except when the property is subject to an ACA Agreement.   Plaintiff does not point to any terms within the contracts which would have an accepted industry meaning different from their ordinary meaning. Accordingly, NWTA's affidavits provide no basis for upholding its interpretation of the contract.

NWTA's final argument is that its interpretation of the contract is consistent with the contract language as a whole.  To support this proposition, NWTA cites to two contract provisions, Section C.4.3 and Section H.3. Section C.4.3 is titled "Closing Activities" and provides that "HUD's buyers may at all times be assisted by their own advisors and attorneys and may choose their own closing agent to represent their interests in the transaction."

Def.'s Appx. 28.  Section H.3 is titled "Prohibitions" and provides that "HUD and its agents shall not require directly or indirectly, as a condition of sale of closing that title insurance covering the property be purchased by the buyer from any particular title company." Def.'s Appx. 46.  NWTA argues that these provisions "made it clear that HUD was contractually bound not to interfere with or influence the relationship between the buyer and any closing entity which might be retained by the buyer. . . ." Pl.'s Supp. Resp. 17.  Thus, "if any duty had existed in the contracts for NWTA to provide closing services to the buyer/lender . . . it would constitute a clear violation of . . . the above cited contract. . . ." *Id*. at 18.

NWTA's argument is unavailing because it does not lead to the supposed violation that NWTA alleges could arise.  Purchasers could certainly take advantage of the services provided by NWTA under the government contracts.  The cited provisions merely state the right of a purchaser to use a title agency of their own choosing should they so desire.  Nothing in the contract can be fairly interpreted as forcing a purchaser to use NWTA's services over any other title agency.

## CONCLUSION

For the reasons set forth above, the court concludes that the language of the contract is unambiguous in disallowing a contractor from charging closing fees to purchasers except in certain limited exceptions.  Because NWTA has not alleged that the exception applies to any of the fees it was unable to collect from purchasers, the court holds that no breach of the contracts has occurred.  Accordingly, the court grants defendant's motion for summary judgment.   The clerk is directed to enter judgment accordingly.

s/Eric G. Bruggink
Eric G. Bruggink
Judge